Date signed September 10, 2008



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MARYLAND
### at GREENBELT

| | | | |
|---|---|---|---|
| In Re: | * | | |
| Thomas Earl Taylor, | * | Case No. | 07-10977-TJC |
| | * | Chapter | 13 |
| Debtor | * | | |
| ************************************ | * | | |
| Thomas Earl Taylor, | * | | |
| | * | | |
| | * | Adversary | |
| Plaintiff, | * | Case No. | 07-00718-TJC |
| vs. | * | | |
| Furnace Associates, Inc., | * | | |
| Accredited Home Lenders, Inc., | * | | |
| GMAC Mortgage, LLC, | * | | |
| Defendants. | * | | |

## **MEMORANDUM OF DECISION**

Defendant and cross-claimant Furnace Associates, Inc. ("Furnace") and defendant and cross-claimant Accredited Home Lenders, Inc. ("Accredited") have filed cross-motions for summary judgment on their cross-claims. Furnace and Accredited each hold a lien against real

1

estate known as 8506 Hillview Road in Prince George's County, Maryland (the "Property"). Accredited contends that it is entitled to priority under the doctrine of equitable subrogation. Furnace disputes this, and contends that its judgment lien is entitled to priority because it was recorded first. For the reasons stated herein, the Court concludes that Accredited is entitled to be equitably subrogated to the rights of the holder of the prior first and second deeds of trusts against the Property, as described further herein.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 11 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1409.

## I. MATERIAL FACTS NOT IN DISPUTE

The Debtor Thomas Earl Taylor (the "Debtor") is the owner of the Property, which serves as his primary residence.

On June 3, 2004, Furnace obtained a judgment against the Debtor in the amount of $197,377.09 in Fairfax County, Virginia. Furnace recorded its judgment in the land records of Prince George's County, Maryland, on July 28, 2005.

Pursuant to promissory notes dated April 1, 2005, the Debtor obtained from GE Money Bank a first deed of trust loan in the amount of $280,000.00 (the "GE First Deed of Trust Loan"), and a second deed of trust loan in the amount of $52,500.00 (the "GE Second Deed of Trust Loan"). The deeds of trust that secured the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan were duly recorded in the land records on June 3, 2005. Accordingly, at the time Furnace recorded its judgment on July 28, 2005, its judgment lien on the Property was junior to the liens of the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan.

The Debtor applied to refinance his GE First Deed of Trust Loan and GE Second Deed of Trust Loan with Aames Funding Corporation, d/b/a/ Aames Home Loan ("Aames"). On November 1, 2005, Aames made two loans to the Debtor: a $361,600.00 loan (the "First Aames Deed of Trust Loan") and a $90,400.00 loan (the "Second Aames Deed of Trust Loan"). The First Aames Deed of Trust Loan and the Second Aames Deed of Trust Loan (collectively referred to as the "Aames Loans") are each secured by a separate deed of trust on the Property.

At the time the Aames Loans were made, the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan had been transferred to Chase Home Finance, LLC. ("Chase"). A portion of the proceeds of the Aames Loans were paid to Chase to satisfy in full the GE First Deed of Trust Loan, which had a balance at that time of $283,926.73, and to satisfy in full the GE Second Deed of Trust Loan, which had a balance at the time of $52,884.83, for a total payoff of $336,811.56. The total payoff amount is less than the amount of the First Aames Deed of Trust Loan.

None of the proceeds of the Aames Loans in excess of the funds used to pay off the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan were paid toward Furnace's judgment lien. The Debtor received cash proceeds from the Aames Loans of an amount in excess of $76,000.

Aames made the First Aames Deed of Trust Loan and the Second Aames Deed of Trust Loan with the intention of obtaining a first and second priority lien against the Property, respectively. The HUD-1 settlement statement stated that the Aames Loans were a "Refinance" and identifies that the proceeds from the Aames Loans were to be paid to Chase to pay off the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan. Aames' "Closing Instructions" to the settlement agent, ATM Corporation of America ("ATM"), specifically stated

that (1) the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan were to be paid off from the proceeds of the Aames Loans at settlement; (2) the settlement agent was to "confirm, then pay, the exact amount of all liens of record . . ."; (3) the Aames loan "must record in the first lien position;" and (4) "our . . . deed of trust must record in the first lien position." Accordingly, there is no real dispute that the proceeds of the Aames First Deed of Trust Loan were used to pay off the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan because the record is clear that Aames would not have funded the Aames First Deed of Trust Loan without obtaining a first priority lien against the Property.

It is not disputed that, at the time that Aames made the loans to the Debtor, it did not have actual knowledge that Furnace had obtained or recorded the judgment. It is also not disputed that the Debtor did not disclose the judgment on his loan application or at any time during the loan process.[1] The Furnace judgment did not appear on the Debtor's credit report, which Aames obtained prior to making the loans.

Aames, through ATM, retained Management Information Company of Virginia ("MIC") to determine if any judgment liens existed against the Property. The information received indicated that no state or federal judgments existed against the Property. MIC provided ATM with a "Property Insight Judgment Report" that showed no judgment liens on the Property.

On January 23, 2006, Chase, as the successor to GE Money Bank, released the deeds of trust securing the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan. Aames recorded the deeds of trust that secured the First Aames Deed of Trust Loan and the Second Aames Deed of Trust Loan on February 3, 2006.

---

[1] According to the Debtor's interrogatory response, he did not disclose the Furnace judgment because he "was not aware and/or did not understand that the judgment was in effect in Prince George's County until he was so advised in December 2005.").

On August 25, 2006, Furnace filed a Writ of Execution in Prince George's County, directing the sheriff to levy the Property. The foreclosure sale was scheduled for February 1, 2007. On January 31, 2007, the Debtor filed his Chapter 13 bankruptcy petition, staying the foreclosure sale.

Accredited is the successor in interest to Aames' First Deed of Trust Loan and GMAC is the successor in interest to Aames' Second Deed of Trust Loan.

On September 20, 2007, the Debtor initiated this adversary proceeding by filing the Amended Complaint to Determine Secured Status and to Avoid Lien. The Debtor initially seeks a determination of the priority status among the various liens against the Property. The Debtor avers that the value of the Property is $425,000, and the liens against the Property total $648,617. Accordingly, the Debtor ultimately seeks in this adversary proceeding a determination that the lien that is determined to be junior should be avoided pursuant to §506(a) and §1322(b)(2) of the United States Bankruptcy Code, 11 U.S.C. §101, et.seq. [2]

Furnace filed its answer to the complaint, cross-claim against Accredited and counter-claim to lift the automatic stay on September 26, 2007. Accredited filed its answer to the complaint and its cross-claims and counter-claims against the Debtor, Furnace and GMAC, and its answer to Furnace's cross-claim on November 2, 2007. Having never responded to the Debtor's complaint or any of the cross-claims and counter-claims, the Court filed an entry of default against GMAC on February 26, 2008.

---

[2] Although each party refers to its motion as one for summary judgment, in essence the motions are for partial summary judgment. As explained further above, the Debtor's complaint seeks a determination of the priority of the various liens against the Property. Once that is established, the Debtor seeks a determination that the junior lien or liens should be avoided. Thus this decision is merely the first step in resolving this adversary proceeding.

Furnace and Accredited filed cross-motions for summary judgment, oppositions and reply memoranda, and the Court held a hearing on the motions on July 23, 2008. The parties filed supplemental memoranda on August 13, 2008. This decision follows.

## II.  CONCLUSIONS OF LAW

### A.  Summary Judgment Standards

Summary judgment may only be awarded by a Court when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Mercantile Peninsula Bank v.French (In re French), 499 F.3d 345, 351 (4th Cir. 2007)(citation omitted). Federal Rule of Civil Procedure 56(c), made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted forthwith ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). When considering a motion for summary judgment, a Court "must consider whether a reasonable jury could find in favor of the nonmoving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the nonmovant." In re French at 352, quoting In re Apex Express Corp., 190 F.3d 624, 633 (4th Cir. 1999).

6

### B. The Parties' Arguments

Accredited seeks a determination that it is equitably subrogated to all of the rights of the holder of the GE First Deed of Trust Loan to the extent of $283,926.73 and the GE Second Deed of Trust Loan to the extent of $52,884.83, for the total amount of $336,811.56. Accredited limits its subrogation claim to these amounts because these were the amounts of the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan, respectively, when the proceeds of the Aames Loans were used to pay them off.

Furnace contends that Aames had constructive knowledge of the Furnace judgment because it had been properly recorded in the Prince George's County land records at the time the Aames Loans were made and recorded. Furnace contends that Aames' constructive knowledge prevents the application of the doctrine of equitable subrogation. Furnace also argues that Aames was negligent in its diligence to discover any judgments or other liens on the Property, and thus equitable subrogation should not apply. Finally, Furnace argues that if equitable subrogation is applied, it will be placed in a worse position than if the Debtor had not refinanced, because the Debtor received cash in excess of $76,000.00 from the refinance.

### C. Equitable Subrogation

The doctrine of equitable subrogation provides that one who pays the lien of another and takes a new lien as security will be subrogated to the rights of the first lienholder as against any intervening lienholders. G.E. Capital Mortgage Servs v. Levenson, 657 A.2d 1170, 1175 (Md. 1995). Based on "principles of natural reason and justice, [equitable] subrogation is a highly favored doctrine and expansively applied." Rinn v. First Union Nat'l Bank, 176 B.R. 401, 408 (D. Md. 1995). Equitable subrogation is a state law doctrine, and thus its application differs

from state to state.  Bruce White & William Medford, Equitable Subrogation: The Saving Grace for Unperfected Lenders?, 24-6 ABIJ 38, 38-39 (2005).

The decisive case in Maryland regarding the application of equitable subrogation is G.E. Capital Mortgage Servs v. Levenson, 657 A.2d 1170 (Md. 1995).  There, a mortgagee obtained a loan with First Federal, after which Levenson recorded three judgments liens against the mortgagee's property.  The mortgagee refinanced with Traveler's who had no actual knowledge of Levenson's judgment liens.  Traveler's interest in the mortgage was succeeded by G.E. Capital, which sought to foreclose on the property.  G.E. Capital only learned of Levenson's judgment liens when Levenson contacted it regarding the imminent foreclosure sale.  Levenson and G.E. Capital struck a deal that G.E. Capital would not bid higher than the difference between the refinanced amount and the property's value.  After G.E. Capital successfully bid on the property, Levenson became aware of the doctrine of equitable subrogation and filed suit to set aside G.E. Capital's first priority.

The G.E. Capital case described subrogation as "the substitution of one person to the position of another, an obligee, whose claim he has satisfied . . . the basic principles underlying subrogation are the same as those in constructive trusts, prevention of merger, and equitable liens, *i.e.*, restitution to prevent forfeiture and unjust enrichment." Id. at 1171, quoting G.E. OSBORNE, HANDBOOK ON THE LAW OF MORTGAGES § 277, at 561 (2d ed. 1970) (Osborne).  The G.E. Capital Court further stated that:

> Where a lender has advanced money for the purpose of discharging a prior encumbrance in reliance upon obtaining security equivalent to the discharged lien, and his money is so used, the majority and preferable rule is that if he did so in ignorance of junior liens or other interests he will be subrogated to the prior lien. Although stressed in some cases as an objection to relief, neither negligence nor constructive notice should be material.

G.E. Capital at 1172, quoting OSBORNE, § 282, at 570.

In this case, there is no issue of disputed fact that when Aames made the Aames Loans, it did so with the express intention and understanding that (1) the loan proceeds would be used to pay off the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan, and (2) it would obtain a first and second priority lien position against the Property for the First Aames Deed of Trust Loan and the Second Aames Deed of Trust Loan, respectively. These facts were established by the loan documents, settlement statement and closing instructions, as well as by the affidavits submitted by Accredited. No documents or affidavits were submitted by Furnace that raised a disputed issue as to these facts. Accordingly, Accredited would be entitled to equitable subrogation absent some reason to deny Accredited relief.

Furnace contends that a refinancing lienholder who has constructive knowledge of a recorded intervening lien or who has been negligent in attempting to discover any intervening liens cannot be excused from making such a mistake, and thus cannot rely on the doctrine of equitable subrogation. Furnace argues that Aames had constructive knowledge of Furnace's lien because it was duly recorded in the land records. Furnace also contends that Aames's agent negligently searched the land records and such negligence should bar Accredited from relief.

Furnace relies on select language in G.E. Capital. There, the Court discussed Metropolitan Life Ins. Co. v. Craven, 101 P.2d 237, 239 (Ore. 1940), which stated that

> Our examination of the authorities leads us to the conclusion that, numerically, the greater weight of authority is to the effect that one, advancing money to discharge a prior lien on real or personal property and taking a new mortgage as security, is held to be entitled to subrogation to the prior lien as against the holder of an intervening lien of which he was excusably ignorant.

G.E. Capital at 1175. Furnace contends that, by quoting the above passage from the Oregon court, the Maryland Court of Appeals adopted a standard that requires a party seeking equitable subrogation to show that it was "excusably ignorant" of the intervening lien.

9

In <u>Craven</u> a debtor obtained a mortgage and a creditor recorded a judgment lien upon the property. When seeking to refinance, the debtor did not disclose the existence of the judgment lien, and the refinancing mortgagee's title abstract did not reveal it. After the refinance, the new mortgagee discovered the intervening lien and sought to be equitably subrogated to the first mortgagee's position. The <u>Craven</u> court found that even if the intervening lien was a matter of public record, a mortgagee's ignorance of such at the time of refinancing would allow equitable subrogation, absent negligence. <u>Craven</u> at 239. In fact, the <u>Craven</u> court stated:

> We think that where the holder of the junior lien will stand in the same position, if subrogation is allowed, as that in which he stood originally, and misrepresentation is made by the owner of the property to the effect that there is no junior lien, and the party advancing the money to defray the prior lien is not guilty of negligence, but secures an abstract from a reputable abstract company, submits the abstract to skilled attorneys and receives a report to the effect that it does not disclose any such junior lien upon the property involved, the right of substitution or subrogation to the priority of the prior lien is available.

<u>Craven</u> at 241. Thus it appears from <u>Craven</u> that, in Oregon, negligence in failing to check the land records by the new mortgagee will prevent the application of equitable subrogation.

This Court need not dwell for long on the extent to which a party seeking equitable subrogation in Oregon must establish that it was not negligent in its actions. The <u>G.E. Capital</u> Court quoted the <u>Craven</u> opinion as an introductory statement surveying the law of equitable subrogation among the various state courts. See supra at 9, <u>G.E. Capital</u> at 1175, quoting <u>Craven</u> ("Our examination of the authorities leads us to the conclusion that, numerically, the greater weight of authority is to the effect that . . ."). There is nothing in the <u>G.E. Capital</u> opinion to suggest that the quoted passage was intended to be a definitive statement of the law in Maryland.

Furthermore, the <u>G.E. Capital</u> court cited with approval its prior holding in <u>Bennett v. Westfall</u>, 46 A.2d 368 (Md. 1946). There, an intervening lienholder obtained a judgment against a husband and wife who owned property encumbered by a first and a second mortgage. When

10

the second mortgage matured, the parties agreed to an extension which was effectuated by the release of the second mortgage and the execution of a new mortgage securing a greater debt. The increase ultimately was held to be a usurious interest. The second mortgagee had not examined the property's title before releasing the second lien and taking the new mortgage, and when the second mortgagee discovered the intervening judgment, he sued to have the lien of the released second mortgage declared to be in effect. In affirming that relief, the Bennett Court said:

> It is clear that appellee's failure to consult the Land Records in no way affected the appellant. It certainly did him no harm. If his contention is sustained in this case it will do him a great deal of good, and this, too, because of a mistake made by appellee in not consulting the Land Records. His position is: You made a mistake, it did me no harm; in fact, resulted in greatly benefiting me. Therefore, you can not [sic] have your mistake corrected. This position has no appeal to a court of equity. Negligence, therefore, if any there was, committed by appellee, caused no harm to the appellant and it is immaterial.

G.E. Capital at 1177, quoting Bennett at 361 (emphasis added).

Thus it is clear that in Maryland, a refinancing lienholder's constructive knowledge has no effect on the application of equitable subrogation, and its negligence only has an effect on the application of equitable subrogation if the intervening lienholder is placed in a worse position than if the refinance had not occurred. In this case, there is no dispute that (1) the Debtor failed to disclose the existence of the intervening lien in the loan application process, and (2) Aames retained a party to search the land records but the existence of the intervening lien was not discovered. In Bennett, the Maryland Court of Appeals held that failure to search the land records for any intervening liens does not bar the application of equitable subrogation. If failing to search the land records is not a bar to the applicability of the doctrine, then negligently conducting a search cannot be a bar. Accordingly this Court concludes that Furnace's claim that Aames, as Accredited's predecessor, or Aames' agent negligently conducted the search of the

11

land records does not create a material issue of fact preventing the grant of Accredited's motion for summary judgment where no prejudice to Furnace results.

Furnace argues that it is harmed because the Debtor received more than $76,000 in equity from the refinance. This would cause Furnace harm only if Accredited were seeking to be equitably subrogated for the entire amount of the Aames Loans—but it is not. By seeking to be equitably subrogated only to the amount Aames advanced to pay off the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan, Accredited does not seek to place Furnace in any position other than it was in at the time of the refinance. The following tables illustrate:

(A)  Lien/Equity Positions Immediately Before Refinance:

| | |
|---|---:|
| GE First Deed of Trust Loan: | $283,926 |
| GE Second Deed of Trust Loan: | $52,884 |
| Furnace judgment lien: | $197,377 |
| Debtor's equity, if any: | Any excess |

(B)  Lien/Equity Positions if Equitable Subrogation Allowed:

| | |
|---|---:|
| Accredited (as holder of the Aames First Loan to the extent subrogated): | $283,926 |
| Accredited (as holder of the Aames First Loan, to the extent subrogated): | $52,884 |
| Furnace judgment lien: | $197,377 |
| Accredited (as holder of the balance of the Aames Loans): | $115,190 |
| Debtor's equity, if any: | Any excess |

(C) Lien/Equity Positions if Equitable Subrogation Not Allowed:

| | |
|---|---:|
| Furnace judgment lien: | $197,377 |
| Accredited (as holder of the Aames Loans): | $452,000 |
| Debtor's equity, if any: | Any excess |

As the foregoing illustrates, Furnace is not harmed by equitable subrogation; it will be placed in the same position as if the refinance had not occurred. Moreover, any equity taken by the Debtor from the refinance will not harm Furnace since Accredited will be subrogated only to the amounts used to pay off the GE First Deed of Trust Loan and the GE Second Deed of Trust Loan. On the other hand, if equitable subrogation is denied to Accredited, Furnace will receive a windfall by moving into a first lien position on the Property at the expense of Accredited.

Furnace also argues that Accredited should be denied equitable subrogation because of the ten day gap between the time that GE Money Bank released its lien on January 23, 2006 and that Aames's recorded its liens on February 3, 2006. It is clear, however, that in Maryland equitable subrogation occurs at the time when the second mortgagee pays off the first lien, and not when it records the new lien. The G.E. Capital Court, for example, defined the term "intervening lienholder" as follows:

> By "intervening lienholder" we mean intervening in the sequence presented in this case when there has been a prior lien and then the intervening lien, followed by the release of the prior lien and the creation of a new lien in favor of the party who paid for the release of the prior lien. Excluded from the concept "intervening lienholder" is the sequence when there has been a prior lien, a release of the prior lien, a lien in favor of some third party, and then the creation of a lien in favor of the party who paid for the release of prior lien.

G.E. Capital at 1175, n.1 (internal citation omitted). The definition does not require that the new lien must be filed before the prior lien is released. Indeed, equitable subrogation has been applied where the party seeking subrogation failed to even file a lien. Rinn at 409-10 ("equity, regarding that as done which ought to have been done, treats the assignment as being made as soon as the right to subrogation arises, which is ordinarily the time at which the subrogee pays the debt"). See also, Security Insurance Company of New haven v. Mangan, 242 A.2d 482, 485 (Md. Ct. App. 1968)(equitable subrogation arises where "one having a liability or a right or a

13

fiduciary relation in the premises pays a debt owing by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid."). Thus, Aames, as Accredited's predecessor in interest, became entitled to equitable subrogation on November 1, 2005, when it paid off GE Money Bank's First and Second Deed of Trust Loans.[3]

Finally, Furnace argues that it has been harmed as a result of the passage of time since the refinance, during which the value of the Property has declined. But assuming the Property has declined in value, Furnace is in no different position than it would have been if the refinance had not occurred. No case cited by Furnace supports the contention that a decline in value of the property over a period of time has any bearing on whether to apply equitable subrogation.

### III. CONCLUSION

For the foregoing reasons the Court will enter an order equitably subrogating Accredited to the rights of the holder of the GE First Deed of Trust Loan to the extent of $283,926.73 and the GE Second Deed of Trust Loan to the extent of $52,884.83, for the total amount of $336,811.56.

Copies to:

Thomas Earl Taylor
8506 Hillview Road
Landover, MD 20785

Jonathan Morgan, Esq.
50 W. Edmonston Drive, Suite 600

---

[3] Furnace cites several cases in which the court refused to apply equitable subrogation, arguing that a gap in between the release of the old lien and the recording of the new lien was the reason for the court's decision. See In re Simms, 300 B.R. 877 (Bankr. S.D. W.Va. 2003); Ohio Dep't of Taxation v. Jones, 399 N.E.2d 1215 (Ohio 1980); Dedes v. Strickland, 414 S.E.2d 134; Landmark Bank v. Ciaravino, 752 S.W.2d 923 (Mo. 1988). However, these cases held that equitable subrogation was inapplicable or barred due to state law. As mentioned earlier, equitable subrogation is a state law issue, and each state applies it differently. See supra at 7. In Maryland, neither negligence nor a gap in between release and recording of liens bars equitable subrogation.

Rockville, MD 20852

Furnace Associates, Inc.
10001 Furnace Road
Lorton, VA 22079

Stephen Annino, Esq.
7653 Leesburg Pike
Falls Church, VA 22043

Accredited Home Lenders, Inc.
16550 West Bernardo Drive, Bldg. 1
San Diego, CA 92127

Jeffrey Fisher, Esq.
9440 Pennsylvania Ave, Suite 350
Upper Marlboro, MD 20772

Elizabeth Nowinski, Esq.
36 South Charles Street, Suite 2300
Baltimore, MD 21201

Timothy Branigan, Trustee
PO Box 1902
Laurel, MD 20725-1902

**END OF MEMORANDUM**